[Cite as *In re S.W.*, 2018-Ohio-1049.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE: S.W. | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| | : | Hon. William B. Hoffman, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | |
| | : | Case No. 2017CA00220 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2016JCV01118

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      March 21, 2018

APPEARANCES:

For Plaintiff-Appellee

JAMES B. PHILLIPS
Stark County JFS
300 Market Avenue North
Canton, Ohio 44702

For Defendant-Appellant N.W.

AARON KOVALCHIK
116 Cleveland Ave. N.W.
Suite 808
Canton, Ohio 44702

*Baldwin, J.*

**{¶1}** Appellant N.W. appeals from the October 30, 2017 Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, terminating her parental rights and granting permanent custody of S.W. to Stark County Department of Job and Family Services.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** Appellant N.W. is the biological mother of S.W. (DOB 12/01/16). On December 2, 2016, a complaint was filed alleging that S.W. was a dependent and neglected child. As memorialized in a Judgment Entry filed on the same day, Stark County Department of Job and Family Services (SCDJFS) took S.W. into shelter care custody. On February 22, 2017, the trial court found S.W. to be dependent and placed S.W. into the temporary custody of SCDJFS.

**{¶3}** On July 28, 2017, SCDJFS filed a motion seeking permanent custody of S.W. Appellant, on October 20, 2017, filed a motion asking for an extension of temporary custody for an additional six months.

**{¶4}** A hearing on the motion for permanent custody was held on October 26, 2017. At the hearing, S.W.'s father stipulated to permanent custody.

**{¶5}** At the hearing, Dr. Amie Thomas, a licensed psychologist with Northeast Behavioral Health, testified that appellant was referred to her for a parenting evaluation by SCDJFS in a prior case and that was adopted for purposes of the case plan in this case. Dr. Thomas testified that she issued a report dated March 21, 2016. According to Dr. Thomas, appellant had a full scale IQ of 73 and was "functioning within the below

average range of mental intellectual ability." Transcript at 11. The following is an excerpt from her testimony at the hearing:

> A: She [appellant] was defensive in her approach to all of the testing, however, her disclosures including her self-reported history revealed concerns with aspects of her personality. Um…with regard to her performance to the SCID-II. Um…for instance she described a pattern of involvement with men of questionable character. She's historically tolerated abusive relationships. Um…she appeared to engage in indiscriminate sexual activities. She was unaware of the father of two of her children until after DNA testing confirmed the results of paternity. So based on her disclosures and her pattern of behavior, I diagnosed her with dependent personality disorder.

{¶6} Transcript at 11-12. Dr. Thomas indicated that people diagnosed with this disorder tolerated unhealthy or dysfunctional relationships and depended on others to meet their basic needs. She testified that this could impact parenting because it often put children in harm's way. Dr. Thomas noted that as a result of appellant's relationship with S.W.'s father, her parental rights had been terminated in Tuscarawas County with respect to three older children. She voiced concerns that appellant had not learned from her past mistakes "as it relates to pursuing questionable romantic relationships." Transcript at 12.

{¶7} Dr. Thomas testified that after completing case plan services in her Tuscarawas County case, appellant regained two of her older children and then, after reconciling with S.W's father who abused another child in the home, the children were removed again. She testified that appellant exposed her children to dangerous people

with anger management issues and that, when she conducted her evaluation with appellant, appellant had disclosed to her that she was once again in a relationship with a questionable man who had been incarcerated and had a criminal history that included theft and breaking and entering offenses. When Dr. Thomas asked appellant if she had concerns about his criminal history, appellant "relayed that he wasn't a serial killer, so therefore she appeared dismissive of the criminal charges that he had." Transcript at 13. She further testified that the father of another of appellant's children had an extensive criminal history.

{¶8} According to Dr. Thomas, appellant disclosed to her that S.W.'s father had been physically and emotionally abusive to her. She told Dr. Thomas that he had kicked and choked her and had physically abused the children who were the subject of the Tuscarawas County case. When asked if appellant acknowledged to her that she knew that S.W.'s father had caused the injuries, but chose to have at least two more children with him, Dr. Thomas stated that she had. Dr. Thomas further testified that she was concerned with appellant's pattern of instability with respect to employment and housing and noted that appellant had lived with several different family members. She recommended that appellant demonstrate the ability to maintain appropriate housing and secure employment. Dr. Thomas diagnosed appellant with borderline intellectual functioning and dependent personality disorder and testified that appellant disclosed to her that she may have been diagnosed in the past with borderline personality disorder.

{¶9} Dr. Thomas recommended that appellant participate in counseling services at Renew to address her problems with choosing problematic romantic partners and her sex disorder, that she successfully complete Goodwill parenting classes and comply with

all recommendations, and that appellant demonstrate the ability to secure and maintain gainful employment and appropriate housing. Once again, she testified that appellant did not learn from her mistakes. Dr. Thomas stated that she had serious concerns about appellant's ability to parent an infant due to appellant pattern of unhealthy relationships and inability or unwillingness to protect children from partners who were abusive to children.

{¶10} On cross-examination, Dr. Thomas testified that she did not consider obtaining a certificate for nutrition and attendance at Goodwill to be a successful completion of Goodwill parenting. On redirect, she testified that the point of Goodwill parenting was to actually be able to demonstrate what was presented and that if the examiner felt that appellant was not able to do that, then appellant had not successfully completed the program.

{¶11} The next witness to testify was Amy Humrighouse who is a parenting instructor at Goodwill. She testified that appellant completed her class back in 2015 with respect to S.W.'s sibling. Appellant received a certificate of attendance, but Humrighouse testified that attendance was not considered successful completion of the program. According to her, appellant, during the classes, was sometimes tardy and did not participate much. Humrighouse testified that one of the goals concerned healthy, violence-free relationships and that she learned that appellant was getting transportation to the classes from someone who had been previously charged with abusing appellant's children. Appellant did not disclose this to her, which concerned Humrighouse greatly. When questioned about appellant's interaction with S.W. during the course of the classes, she noted that appellant almost fell asleep one day while leaning over S.W. and that the

staff had to intervene. The major concern was over appellant's involvement with S.W.'s father.

{¶12} Humrighouse testified that when appellant completed her class, she was not able to meet her own basic needs. Appellant did not have housing or transportation and had just been fired.　The following testimony was adduced when Humrighouse was asked whether she had recommended reunification　when she produced her report relating to appellant's child that was born on December 20, 2015:

Q: Okay. Did you recommend reunification at that point in time with mother?

A: I think it was seriously a, a big concern with that, the independent hou (SIC), she had nowhere to live.

Q: Um-hum.

A: So definitely it was a concern that until she could meet those responsibilities it would not be in the best interest for a baby to be returned to her home.

Q: Did her decision making and her uh…continued relationsh (SIC), put herself in relationships with questionable individuals cause you concern?

A: Absolutely.

Q: What recommendations did you make for mother at the end of your involvement with her?

A: In the recommendations, it was to definitely cooperate with her Stark County Department of Job and Family Services caseworker and follow all recommendations of Ms. Gable.　Continue counseling at Renew and follow recommendations.　Obtain employment.　Obtain stable independent

housing. If in the event of reunification, the services of home-based parenting plus program.

**{¶13}** Transcript at 30.

**{¶14}** Kimberly Habrun, a caseworker with SCDJFS who was assigned to this case, testified that she had been involved with appellant previously with respect to a child born before S.W. on December 20, 2015. She testified that the agency had concerns with appellant having lost permanent custody of three other children in Tuscarawas County and that there were issues relating to appellant's living arrangements and her inability to meet basic needs in appellant's other Stark County case.  Habrun testified that appellant had been provided with a case plan and services, but did not successfully complete the services in that case. After a trial, the agency received legal custody of that child.

**{¶15}** Habrun testified that she reviewed records regarding the Tuscarawas County case and that the concerns in Tuscarawas County were appellant's continued relationship with S.W.'s father who had been physically abusive to the children. Appellant failed to successfully complete her case plan services in Tuscarawas County which covered counseling and parenting instruction. Tuscarawas County received permanent custody of the three children.

**{¶16}** Habrun testified that appellant's case plan services in this case included Renew counseling. She testified that appellant was discharged from Renew three times due to attendance issues and had a track record of attending a couple of times and then failing to attend. Appellant did not successfully complete the program. Appellant's case plan also required her to successfully complete Goodwill parenting which she did not. According to Habrun, "[t]hey were not going to send mom…back to Goodwill Parenting

until she had made progress with her own counseling" through Renew. Transcript at 43. She testified that appellant had failed to make progress and had failed to provide verification of employment as requested. While appellant had secured housing and had been living in the house for over a year, Habrun testified that there were concerns about the people who appellant allowed in her house. Appellant allowed S.W.'s father to live with her while he was on house arrest and allowed another man who had been released from prison and who was a violator at large to live with her. Appellant, who was sending money to her boyfriend who was incarcerated, was $2,000.00 dollars behind in rent.

{¶17} When asked, Habrun testified that appellant had a pattern of making inappropriate choices and not meeting or addressing her own basic needs. She testified that the same concerns that the agency had in 2015 it still had and that appellant had not made any progress since 2015 to reduce the risk that she posed to the children. According to Habrun, there were dog feces everywhere in appellant's home. When Habrun discussed the Tuscarawas County case with appellant, appellant told her that she did not believe that physical abuse had been inflicted on the children and thought that she could get the kids, who had been adopted for about five years, back. Habrun also testified that S.W., who was born with a severe cleft lip and cleft palate, had special needs and that appellant could not safely care for him. She testified that she did not believe that there was any benefit to appellant having an extension in this case because during the two years that she worked with appellant, the same concerns still existed.

{¶18} On cross-examination, Habrun testified that while appellant was unsuccessfully discharged from Renew on October 26, 2016, she did not go back until she was served with the complaint in this case approximately two months later. She

testified appellant had not shown or had cancelled six or her seven appointments. On redirect, she testified that appellant had not successfully completed Goodwill or any part of her case plan with the exception of completing her parenting evaluation.

{¶19} At the best interest portion of the hearing, Habrun testified that S.W., due to his severe cleft lip and cleft palate, met with Akron Children's regularly and was going to have several additional surgeries over a long period of time. She testified that he had been diagnosed with dysphasia and was on target in terms of his development. S.W. had been placed with his current foster parents since he was released from the hospital. She testified that the foster parents were meeting all of his medical needs and that they loved him and he was very attached to them. According to her, S.W. identified them as his mother and father and they were interested in adoption. Habrun testified that appellant had missed five visits throughout the case and that two were no call, no shows. When asked about visitation, Habrun testified that there did not appear to be any bond between appellant and S.W. She testified that it was in his best interest for permanent custody to be granted. Habrun noted that S.W.'s foster parents had enabled him to have a relationship with his siblings who had been adopted. She, when asked, stated that she did not think that appellant could safely care for S.W. and, within the near foreseeable future, would not be able to do so.

{¶20} On cross-examination, Habrun testified that she did not believe that an extension should be granted to appellant because S.W. deserved permanency and appellant had not exhibited any changes in two years. On redirect, she testified that she believed that the benefit of permanent custody outweighed any harm that would be caused by breaking any slight bond between appellant and S.W.

**{¶21}** The Guardian Ad Litem recommended that permanent custody be granted to the agency.

**{¶22}** The trial court, as memorized in a Judgment Entry filed on October 30, 2017, found that S.W. could not be placed with appellant at the time or within a reasonable period of time and that appellant had had her parental rights involuntarily terminated with respect to a sibling of the child and had failed to prove by clear and convincing evidence that she could provide a legally secure permanent placement and adequate care for the health, welfare and safety of S.W. He further found that S.W. should not be placed with appellant and that it was in S.W.'s best interest for permanent custody to be granted to SCDJFS. The trial court terminated appellant's parental rights and granted permanent custody of S.W. to the agency. Findings of Fact and Conclusions of Law were filed on the same date and incorporated into the Judgment Entry. A Nunc Pro Tunc Judgment Entry was filed on October 31, 2017.

**{¶23}** Appellant now raises the following assignments of error on appeal:

**{¶24}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILD CANNOT AND SHOULD NOT BE PLACED WITH APPELLANT AT THIS TIME OR WITHIN A REASONABLE PERIOD OF TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**{¶25}** "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**{¶26}** "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT GRANT APPELLANT'S MOTION FOR AN EXTENSION OF TEMPORARY CUSTODY."

I

**{¶27}** Appellant, in her first assignment of error, argues that the court's finding that S.W. could not and should not be placed with her within a reasonable period of time was against the manifest weight and sufficiency of the evidence. We disagree.

**{¶28}** A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954); *In re: Adoption of Holcomb,* 18 Ohio St.3d 361, 481 N.E.2d 613 (1985).

**{¶29}** In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60 (1990); *See also*, *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel,* 55 Ohio St.3d at 74.

**{¶30}** "An appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

**{¶31}** Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 1997-Ohio-260, 674 N.E.2d 1159

**{¶32}** Pursuant to R.C. 2151.414(B), the court may grant permanent custody of a child to the movant if the court determines "that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

**{¶33}** (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, ... and the child cannot be placed with either of the child's parents within a reasonable period of time or should not be placed with the child's parents.* * *….

**{¶34}** Revised Code § 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with a parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with [the] parent within a reasonable time or should not be placed with either parent":

**{¶35}** (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problem that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the child's home. In determining whether the parents have substantially remedied the conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

\*\*\*

**{¶36}** (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior

termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶37} In the case *sub judice*, we find that the trial court's finding that S.W. could not and should not be placed with appellant within a reasonable period of time was not against the manifest weight or sufficiency of the evidence. There was testimony, as set forth above, that appellant had not completed her case plan, had continued involvement with men who were abusive and had criminal histories and that appellant lacked steady employment, transportation and housing. The witnesses testified that appellant had not, over a two year period, progressed and that she made the same mistakes over and over again. Moreover, appellant had had her parental rights terminated when she involuntarily lost permanent custody of three other children in Tuscarawas County and legal custody of one other child in Stark County. As noted by the trial court, appellant had failed to prove by clear and convincing evidence that notwithstanding the prior termination, she could provide a legally secure permanent placement and adequate care for the health, welfare, and safety of S.W.

{¶38} Appellant's first assignment of error is, therefore, overruled.

II

{¶39} Appellant, in her second assignment of error, argues that the trial court's finding that it was in S.W.'s best interest for permanent custody to be granted to SCDJFS is against the manifest weight and sufficiency of the evidence. We disagree.

{¶40} Pursuant to R.C. 2151.414(D)(1), in determining the best interest of a child in a permanent custody proceedings, the court shall consider all relevant factors, including, but not limited to, the following:

{¶41} (a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶42} (b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶43} (c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * * *;

{¶44} (d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶45} *4 (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. * * * *.

{¶46} At the best interest hearing, there was testimony that S.W. has a severe cleft lip, cleft palate and dysphasia and would require several surgeries in the future as well as numerous medical appointments. Kimberly Habrun testified that S.W. was working with Help Me Grow to help him developmentally and that he was on target. She testified that the surgeries would take place over a period of years up until S.W. was twenty years old, if not longer. Habrun further testified that S.W. had been in the same foster home since he was released from the hospital and that the home met all of his medical needs. According to her, S.W.'s foster parents spent "countless hours" learning to properly care for him. Transcript at 63.  She testified that there was a strong bond between S.W. and his foster parents and that S.W. identified his foster parents as his mother and father. The

foster parents, who wanted to adopt S.W., facilitated visitation between S.W. and his siblings who had been adopted.

**{¶47}** Habrun further testified that she did not believe that there was a bond between appellant and S.W. and that even if there was a slight bond, the benefit of permanent custody outweighed any harm caused by granting permanent custody. She testified that appellant had not made any progress in nearly two years and had missed five visits with S.W. even though she lived within walking distance to the agency. Appellant, with respect to two of the scheduled visits, did not call the agency.

**{¶48}** There were not relatives identified for appropriate placement. The Guardian Ad Litem recommended in a written report that permanent custody be granted to SCDJFS.

**{¶49}** Based on the foregoing, we find that trial court's finding that it was in S.W.'s best interest for permanent custody to be granted to SCDJFS is not against the manifest weight or sufficiency of the evidence.

**{¶50}** Appellant's second assignment of error is, therefore, overruled.

III

**{¶51}** Appellant, in her third assignment of error, contends that the trial court abused its discretion when it did not grant her motion for an extension of temporary custody. We disagree.

**{¶52}** A trial court's decision to grant or deny an extension of temporary custody is a discretionary one. R.C. 2151.415(D). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable

and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶53}** Pursuant to R.C. 2151.415(D)(1), if an agency requests an extension of temporary custody for a period of up to six months, a trial court may grant an extension "if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension." We note in the case sub judice, the extension request was made by appellant, not appellee.

**{¶54}** The trial court, in its October 31, 2017 Findings of Fact and Conclusions of Law, found that extending temporary custody to allow appellant to work on her case plan was not in S.W.'s best interest. The trial court stated that based on the evidence, it appeared that appellant would not be able to remedy the initial problems in this case at any time within the foreseeable future. At the hearing, Kimberly Habrun, when asked what would be the harm if appellant was granted an extension to see if she could complete Renew and go to Goodwill, testified that S.W. deserved permanency and "that should not be delayed uh…when mother hasn't exhibited any changes in two years." Transcript at 68. Based on the facts as set forth in detail above, we cannot say that the trial court abused its discretion in denying appellant's request for an extension. The trial court's decision was not arbitrary, unconscionable or unreasonable.

**{¶55}** Based on the foregoing, appellant's third assignment of error is, therefore, overruled.

{¶56} Accordingly, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

By: Baldwin, J.

Delaney, P.J. and

Hoffman, J. concur.